*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

*In re* EGB, Minor.

UNPUBLISHED
May 5, 2022

No. 358612
Wayne Circuit Court
Juvenile Division
LC No. 2021-000333-NA

Before: LETICA, P.J., and REDFORD and RICK, JJ.

PER CURIAM.

Respondent-mother[1] appeals as of right the trial court's order that her minor child, EGB, be removed and made a temporary court ward. The trial court assumed jurisdiction over EGB, under MCL 712A.2(b)(1), because of respondent's failure to provide necessary care for EGB who faced substantial risk of harm to her mental well-being. On appeal, respondent argues that the trial court erred by taking temporary jurisdiction over EGB because respondent cared for EGB's behavioral problems and Children's Protective Services (CPS) failed to provide respondent services. Respondent argues further that insufficient evidence supported jurisdiction. We affirm.

## I. FACTUAL AND PROCEDURAL BACKGROUND

In April 2021, the Michigan Department of Health and Human Services (DHHS), petitioned to remove EGB from respondent's care and custody because of respondent's physical, verbal, and emotional abuse and neglect of EGB. The petition alleged a history of abuse spanning several years. In May 2018, respondent spanked EGB, which resulted in EGB hitting her face on the bathtub and bruising her face. Respondent was offered services for individual therapy, parenting education, and self-control, which she completed. In January 2020, respondent threw a boot at EGB's face, causing a bruise next to EGB's left eye. In March 2020, respondent pinched EGB's forearm resulting in a bruise. DHHS offered respondent services in March 2020 which she did not complete.

---

[1] EGB's father is deceased.

EGB suffered a "full-blown mental health crisis" in March 2020, which appeared to be triggered by respondent. EGB's therapist at the time reported that the crisis lasted four hours and witnessed respondent act "very demeaning towards [EGB]." EGB's therapist recommended that EGB be admitted for partial hospitalization but respondent refused. EGB reported that her mother sometimes discussed inappropriate topics with her. EGB was diagnosed with parent-child relational problems, oppositional defiant disorder, adjustment disorder, and disturbance of conduct. EGB's therapist reported that respondent told EGB that "she hates [EGB], wishes [EGB] was not her kid and that she should have aborted [EGB]." DHHS offered respondent services again in April 2020 which she completed.

Another incident occurred in January 2021 in which respondent hit EGB with a flip-flop on her arm causing a bruise. EGB was taken to the Children's Hospital for a physical abuse examination which indicated that EGB had been subjected to physical abuse.

Respondent admitted that EGB received "regular whoopings for regular kid things[,]" and respondent hit EGB with a flip-flop in the past, but had not done so for the past eight or nine months. Services were allegedly discussed, but respondent refused to participate. The CPS caseworker spoke with EGB's therapist who reported respondent resisted Parent Management Training using the Oregon level (PMTO) program and skipped appointments. EGB's therapist noted respondent refused to take responsibility for her actions, told EGB's therapist and other therapists that they were not skilled enough, and stated that she needed "someone to help [her] detach from [her] emotions." EGB's therapist tried to get respondent involved in mental health treatment but she blamed EGB's behavior for all their issues. Respondent removed EGB from therapy in February 2021. EGB attended a forensic interview during which she stated that she got the bruise on her arm from a "whooping from her mother for being rude, disrespectful, and not listening." EGB stated that respondent hit her with a flip-flop, but also sometimes hits her with a belt, and that respondent had hit her again the day of the interview. The caseworker reported that respondent "exhibited symptoms and behaviors of concern, including: displacing responsibility, continuous verbal aggression/hostility, and anger management concerns."

At the preliminary hearing, the caseworker reported that respondent's statement that she had not hit EGB in eight or nine months was inconsistent with the evidence of physical abuse from the physical abuse examination. The caseworker also explained that respondent stopped EGB's therapy for a month because of her belief that the therapist reported what happened to CPS. The caseworker reported that EGB's therapist believed EGB was at a significant risk of psychological and emotional injury from respondent's abuse. The caseworker testified that the prior physical abuse incidents were substantiated, and respondent received services but she did not benefit from those services.

EGB's therapist informed the caseworker that respondent failed to cooperate with her PMTO therapy. EGB was not on any medication at the time. The caseworker testified that respondent was offered services but she refused. The caseworker, however, also stated that at a certain point services were not offered to respondent because of her previous failures to benefit from the services provided to her. The caseworker confirmed that a criminal investigation involving respondent for the incidents referenced in the petition remained pending.

The trial court ordered EGB's removal from respondent because of the substantiated allegations of physical abuse, noting that EGB's behavioral issues appeared to "be causally related to" respondent. The trial court also noted the alleged emotional abuse. The trial court observed that DHHS had worked with respondent for several years to prevent removal and had offered her a variety of services. The court placed EGB with her paternal grandparents.

At the adjudication, respondent expressed frustration with the stagnation of EGB's therapy progress. She testified that EGB threw tantrums when she could not get what she wanted, and that behavior escalated as she got older to breaking things in the home. Respondent explained that such behavior led her to put EGB into therapy. Respondent stated that when she asked to speak with someone more knowledgeable to handle EGB's behavior, EGB's therapist became offended and told respondent she could seek help elsewhere. Respondent decided to take a break from EGB's therapy while trying to decide where to go for therapy next. EGB missed therapy for approximately one month.

Respondent stated that none of the mental healthcare professionals EGB saw ever brought up the topic of medication. Respondent did not think EGB would benefit from medication because she concluded that EGB's actions were intentional. When asked how she knew EGB's actions were intentional, respondent said: "I know my child." Respondent explained that she physically disciplined EGB when other methods of discipline, such as verbal warnings, time-out, and other threats did not work. When this occurred, respondent gave EGB "a pat on the butt," or used a flip-flop. Respondent asserted that, after she cooperated with CPS and took EGB to the hospital, the caseworker's supervisor threatened to take EGB away. Respondent requested to speak with the supervisor's superior and have a new caseworker assigned, but CPS denied her requests.

Respondent asserted that EGB needed more aggressive treatment and help with anger management. She did not oppose medication generally, but disagreed with medicating EGB without trying to work through her issues with therapy. Respondent stated: "I know my kid. I know when she can control things and when she can't control things" because "[w]hen you can control something you don't have to be medicated." When asked how she knew that, respondent explained that EGB chose to act the way she did. Respondent stated that she did not want EGB to be medicated for the wrong reasons.

Respondent testified that the parent-child relational problems were caused entirely by EGB's defiance. She denied ever telling EGB she hated her or wished that she had aborted EGB. Respondent explained that she terminated her 2020 pregnancy because of EGB's issues. Respondent acknowledged that she told EGB:

> [I]f she wanted me to have the baby, . . . this is stressful. You know, I'm coming up to the school, I might lose it, it's very, very stressful. And you know, you want the baby to be a healthy, nice baby, you got to be good and you've got to listen.

When asked about this statement, respondent denied telling EGB she might lose the baby if EGB did not rectify her behavior. Respondent explained that she only told EGB she was stressing the baby and needed to be a good role model. Respondent believed this an appropriate conversation to have with her eight-year-old child.

Respondent denied telling EGB's therapist she needed help detaching from her emotions and denied needing help managing her emotions or with her parenting skills. Respondent admitted she had no medical training, but claimed she was qualified to determine whether EGB's actions were intentional. Respondent denied being told by a medical professional that EGB needed medication. She asserted that she participated in PMTO until her conversation with EGB's therapist about finding another therapist, after which, her PMTO worker stopped calling to schedule appointments.

The caseworker reported that respondent informed her that she discontinued EGB's therapy because she did not like EGB's therapist. The caseworker did not recall threatening respondent with taking EGB away. The caseworker explained that respondent's failure to take EGB to therapy was a form of neglect because EGB's behavioral problems and diagnoses required counseling. The caseworker saw a bond between EGB and respondent, and noted, while it did not appear EGB was afraid of respondent at their first meeting, she did appear very timid.

EGB's therapist testified that many patients make sporadic progress, and EGB's progress was not unusual. EGB's therapist identified inconsistent parenting styles used by respondent and EGB's paternal grandparents. Respondent, therefore, had been recommended to participate in PMTO. EGB's therapist explained that differences in parenting styles between caregivers is normal, but the primary issue in EGB's case concerned EGB's paternal grandmother's desire to medicate EGB, and respondent's resistance to medication. EGB's therapist stated that EGB's record did not indicate a need for medication, but it was not unusual for a child with EGB's diagnoses to be prescribed medication.

EGB's paternal grandmother testified regarding EGB's recent hospitalization at the New Oakland Family Center after having a crisis. EGB's behavior improved with medication. EGB's grandmother observed that, when EGB spent time with respondent, she would stop following directions. EGB had been on the medication for almost three weeks, and EGB's grandmother reported a significant difference in EGB's ability to mentally process and handle directions. EGB's grandmother had discussed medication for EGB with respondent when EGB was in second grade. EGB's grandmother stated that respondent never opposed the idea of medicating EGB.

Respondent had EGB evaluated by six psychiatrists, none of whom recommended medication. However, respondent acknowledged they listed medication as an option. Respondent admitted that if she did not like the option offered by one psychiatrist, she went to another. She said that all the psychiatrists had different diagnoses for EGB. Respondent disagreed with EGB's grandmother's suggestion that EGB may have attention deficit hyperactivity disorder (ADHD), but admitted that psychiatrists had diagnosed EGB with ADHD. Respondent felt that because EGB's actions were often intentional, EGB did not have ADHD.

The trial court took temporary jurisdiction over EGB. The trial court acknowledged respondent's efforts to provide services for EGB, but found that respondent's behavior created a substantial risk of harm to EGB's mental well-being, and noted that EGB had seen progress with medication.

## II. STANDARD OF REVIEW

"To properly exercise jurisdiction, the trial court must find that a statutory basis for jurisdiction exists." *In re BZ*, 264 Mich App 286, 295; 690 NW2d 505 (2004). "Jurisdiction must be established by a preponderance of the evidence." *Id.*; MCR 5.972(C)(1). "We review the trial court's decision to exercise jurisdiction for clear error in light of the court's findings of fact[.]" *Id.* "A finding is clearly erroneous if although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been made." *In re COH, ERH, JRG, & KBH*, 495 Mich 184, 203-204; 848 NW2d 107 (2014) (quotation marks and citation omitted). "Thus, under the clear-error standard, a reviewing court should not substitute its judgment on questions of fact unless the factual determination clearly preponderates in the opposite direction." *Id.* at 204 (quotation marks and citation omitted). "Whether child protective proceedings complied with a parent's right to procedural due process presents a question of constitutional law, which we review de novo." *In re Sanders*, 495 Mich 394, 403-404; 852 NW2d 524 (2014).

## III. ANALYSIS

Respondent argues that the trial court erred by exercising jurisdiction over EGB and making her a temporary court ward. We disagree.

"Child protective proceedings are generally divided into two phases: the adjudicative and the dispositional." *In re Brock*, 442 Mich 101, 108; 499 NW2d 752 (1993). "The adjudicative phase determines whether the probate court may exercise jurisdiction over the child." *Id.* "In order to find that a child comes within the court's jurisdiction, at least one statutory ground for jurisdiction contained in MCL 712A.2(b) must be proven, either at trial or by plea." *In re SLH*, 277 Mich App 662, 669; 747 NW2d 547 (2008).

The trial court in this case took jurisdiction over EGB under MCL 712A.2 which provides in relevant part:

> The court has the following authority and jurisdiction:
>
> * * *
>
> (b) Jurisdiction in proceedings concerning a juvenile under 18 years of age found within the county:
>
> (1) Whose parent or other person legally responsible for the care and maintenance of the juvenile, when able to do so, neglects or refuses to provide proper or necessary support, education, medical, surgical, or other care necessary for his or her health or morals, who is subject to a substantial risk of harm to his or her mental well-being, who is abandoned by his or her parents, guardian, or other custodian, or who is without proper custody or guardianship. . . .

Respondent contends that the trial court lacked sufficient evidence of respondent's failure to provide proper care for EGB because she only removed EGB from therapy for one month while she sought another, more appropriate therapist. The one-month gap in treatment, however, was

not the only concern regarding respondent's care and treatment of EGB. Respondent had three prior CPS complaints which resulted in referrals for services, two of which respondent completed. Nevertheless, despite the services provided, respondent's parenting methods did not improve and she did not benefit from services provided to her. Respondent denied that the problems concerned her parenting. The record indicates that she attended PMTO but stopped. She blamed her lack of attendance on the worker for not calling her to schedule another appointment after her fallout with EGB's therapist. Respondent, however, never attempted to schedule an appointment herself. Respondent's failure to remedy her deficiencies despite being offered services to develop multiple tools with which to do so continued her failure to provide proper care for EGB.

Further, respondent's opposition to medicating EGB demonstrated her unwillingness to provide care for EGB against medical professionals' opinions that doing so would be beneficial to EGB. When medical professionals raised the topic for discussion, she rejected the idea. The record indicates that respondent took EGB to six psychiatrists to obtain an opinion she liked. Respondent attempted to justify her action by contending that the different psychiatrists provided different diagnoses for EGB. The record, however, lacks any evidence to support her contention. The record reflects that respondent rejected the professionals' assessments because they did not agree with respondent's belief that EGB's actions were intentional. Respondent also rejected EGB's ADHD diagnosis by a psychiatrist because she felt that EGB focused well when with her. When asked, in the absence of medical expertise, how she knew her conclusions were true, she simply responded: "I know my kid." The record indicates that EGB showed visible progress in only three weeks after being put on medication. Respondent's refusal to accept expert opinions contrary to her own beliefs harmed EGB by failing to provide proper medical care for EGB's mental health and well-being.

The trial court correctly determined that EGB faced a substantial risk of harm to her mental and physical well-being from respondent's actions. The record indicates four substantiated incidents of physical abuse committed by respondent against EGB since May 2018. Further, respondent's treatment of EGB created a substantial risk of harm to EGB's mental well-being. Although respondent denied that she told EGB she hated EGB, wished EGB was not her child, and wished she had aborted EGB, EGB reported that respondent had done so. Respondent admitted attempting to coerce EGB into behaving properly by discussing her pregnancy in an inappropriate manner with EGB. When asked whether she believed her conversations with EGB were inappropriate, respondent disagreed. Throughout the proceedings, respondent demonstrated her unwillingness to accept any responsibility for the issues with EGB. The record indicates that respondent chose instead to blame EGB for the problems.

Respondent argues that CPS failed to provide her services during this case. She intimates that DHHS deprived her of due process. The trial court did not deprive respondent of due process and it acted within its statutory authority to exercise jurisdiction over EGB. The record indicates that CPS made reasonable efforts to prevent or eliminate the need for removal of EGB prior to the filing of the petition for removal. Respondent declined the services offered.

Respondent also argues that CPS actively worked against her during the pendency of this case. She presents no evidence, however, other than her own testimony, that demonstrates any improper actions by DHHS or CPS. Moreover, regardless of whether respondent feels CPS treated her unfairly, DHHS presented the trial court ample evidence from which the trial court could

properly find justification for taking jurisdiction over EGB. A preponderance of the evidence established that respondent failed to provide proper care of EGB and support treatment for EGB's behavioral problems. Further, respondent's abusive conduct toward EGB created a substantial risk of harm to EGB's physical and mental well-being. Accordingly, the trial court properly exercised temporary jurisdiction over EGB.

Affirmed.

/s/ Anica Letica
/s/ James Robert Redford
/s/ Michelle M. Rick